We move to the third case today, Donald v. Wexford Health. Excuse me, Mr. Fritz, are you involved in this case? You're going to argue the case? No, Your Honor, I'm leaving the meeting. Thank you very much, though. Mr. Roth, you're proceeding with the next case, is that correct? I am on the appellee's behalf, yes, Your Honor. All right, thank you very much. All right, Mr. Flurry, you may proceed. May it please the court, counsel? This is a Section 1983 prisoner case, including a med mal case. Plaintiff Donald went in with two eyes and came out with one eye. He had a complicated ophthalmological condition known as keratoconus. In addition, he had glaucoma and a history of a corneal transplant. I think one of the issues that is in play here is that the lower court, with all due respect to that court, found that there was no serious medical condition as applied to Dr. Carter because this court has previously indicated that conjunctivitis is not a serious medical condition. We have a significant problem with labeling this case as conjunctivitis as pertains to Dr. Carter. Clearly, our expert believes that the patient had keratoconus, glaucoma, and a corneal transplant, and his complicated history warranted referral out to by a specialist, Dr. Sisher. Dr. Sisher's an ophthalmologist. He recommended the patient be seen in four months by the treating physician that did the actual transplant. The patient was not seen by another physician for almost a year. It was seven days short of a year, I believe. He was next seen by actual medical doctor October the 19th, 2015. Our expert, Dr. Earhart, had a lot of different opinions about this case, but overall, his comment was the care was terrible. The overall management of the case was inappropriate. He was critical of Dr. Carter. I call him Dr. Carter. He's an optometrist. He is not a medical doctor. He's an eyeglass doctor and a doctor that can test you for contacts. In addition to Dr. Earhart, when the family found out that the patient wasn't being properly treated, they contacted the patient's private ophthalmologist who'd done the surgery. Her name is Dr. Crockett. She authored a letter almost eerily predictive that if you don't treat this patient right, he's going to lose his transplant, which she didn't go on in her letter to say, and lose his entire eye like he did. So we very respectfully dispute that the claim by the lower court that Donald didn't have an objectively serious medical condition. In Carter's own- Excuse me, counsel. Counsel, excuse me. Is it correct that during the time that Dr. Carter was seeing Mr. Donald, Mr. Donald's transplant status was being treated with steroids to prevent rejection and that that also has immunosuppressive effects? That's correct. I will confess that that situation seems to me, even if it's relatively stable, like a pretty serious medical condition that needs attention. But what evidence is there that Mr. Donald suffered any harm as a result of anything having to do with Dr. Carter's treatment or non-treatment of him? Well, Dr. Earhart had testified, and I think it's important for the court to know that they attempted to exclude and get Dr. Earhart thrown out and the court ruled ahead of the motion for summary judgment that no, Dr. Earhart expressed quite a lot of opinions about Dr. Earhart. Yes, Dr. Earhart's opinions are part of the record. But my question is, what does the evidence show about actual harm to Mr. Donald during that period of time when we've got the evidence of this later very, very fast moving infection that caused the loss of the eye? Well, the evidence shows that the plaintiff didn't get his contact lenses, that Earhart testified that the reasonable conclusion is that his condition continued to worsen as a result of the poor management, as a result of him not getting the contacts in a timely fashion. And as his eye continued to deteriorate, Earhart- In what way? Dr. Carter treated the glaucoma correctly? Correct, right? Well, he attempted to treat the glaucoma- The pressures went down over the summer of 2015, correct? They were still elevated, Your Honor, above the normal range, and they never one time referred him to an ophthalmologist to see why the pressures continued to stay up. Now, there was one reading, they did go down, Your Honor, but there might've been one that was in the normal range, but they were all elevated, or most of them were elevated. I thought they went down from about 30 to about 16. I'm not sure what the unit of measure is, but am I remembering that correctly? That is correct. There was one reading that was 16. There were several that were in the 20s, I believe. And Carter's treatment with medication brought those down, right? Well, his pressure came down. It remains to be seen whether it was due to the medication or whether it was due to something else, but his pressures did come down. But the redness, as the court in the summary judgment motion said, the parties dispute whether plaintiff's eye were red or not, or whether Carter had any reason to know that the eyes were red. Well, that is commonly referred to, in my view, as a material issue of fact. The court said the parties dispute whether plaintiff's vision was ever reported or observed to be blurry in September. Again, that's commonly known as a material issue of fact when the parties are disputing what the facts show. And so there were clearly some material issues of fact. The court also said, pointed out, plaintiff has not pointed to any testimony from the treating optometrist or the treating ophthalmologist at Illinois Eye Center that plaintiff's eye condition required more, or that there was a problem. Well, if the requirement to proceed is to get the very defendants or one of the defendants to admit that he's done something wrong, plaintiffs would never be able to prevail. There's no requirement that plaintiff is required to obtain testimony from the treating physicians to say that one of us screwed up. That isn't required. What we did is we had Dr. Earhart, a former prior prison physician, testify to that fact, because you're just never going to get a treating physician to talk badly about another treating physician in the case. But Earhart testified that the patient lost his eye due to a lack of care. So the court also said there's no evidence of an optometrist is unqualified to treat this condition. Well, what Earhart testified to was the overall management was terrible and that Carter should have communicated. Now, because he's in a different status as his license, he's limited on what he can say. But clearly Earhart testified that he should have communicated to the treating physicians or to a medical doctor. And those are the, I think, the problems that we have, along with the fact that we believe that there was a serious medical condition here. The court order said there's no evidence from a qualified medical expert that an ophthalmologist was required. Well, it's not only Dr. Earhart saying that, but Dr. Seicher said that and said, get him to see Dr. Crockett. So the last time that he's seen by a medical doctor is in October of 2014. We go nearly a year and the guy has a eye problem. And it's eerie that Dr. Crockett predicted the problems that were going to happen and then they happen. I'm happy to answer any questions that the court might have on this. And I say now, Mr. Brewer, thank you. Mr. Unrath. Thank you, your honors. My name is Craig Unrath. I represent Dr. Anthony Carter. The problem with Plainish's case boils down to the qualifications of his expert, Dr. Earhart, whose testimony was limited to managing and coordinating care for a prison inmate. He isn't qualified to testify as an optometrist or ophthalmologist concerning specific eye care treatment. Now, as the district court noted, this presents a very significant problem. Before plaintiff can argue that Dr. Carter failed to refer him to a specialist, he must first establish that his eye condition required more than Dr. Carter provided or was able to provide. And Dr. Earhart simply isn't qualified to make those determinations. Nor is he qualified to say whether plaintiff's eye condition as it existed in September 2015 was somehow, anyhow related to the eventual loss of his eye. This is beyond his ability, his training as a physician. Now, we have undisputed testimony from two qualified medical experts that the infection that led to the enucleation of Donald's eye was unrelated to the conditions that Dr. Carter managed. Dr. Nim is just one example, noted that the specific and can cause perforation in only 72 hours. Dr. Nim concluded that to a reasonable degree of medical certainty, the earliest indication of a possible corneal rejection or infection was more than three weeks after Dr. Carter's last examination. Plaintiff's expert is not qualified to contest any of those assertions. If plaintiff's claim for medical negligence cannot survive summary judgment, then it most certainly cannot survive the much higher standard of deliberate indifference to a serious medical need. Dr. Rath, can I ask you a question about, I'm troubled by the district court's finding in your serious medical needs related to his eyes while Dr. Carter was treating him. We've got glaucoma, we've got the post-transplant treatment, and including apparently the course of steroids to minimize the risk of rejection. And we've got the keratocoma, I'm sure I'm not pronouncing that quite right, all as conditions that seem to require at least ongoing treatment where the treatment itself raises risks of potential rejection. So all that looks to me like serious medical conditions so that a complete denial of treatment would surely be a problem under the Eighth Amendment. I think you're correct, your honor. I think that a complete denial of treatment under those conditions would be a problem under the Eighth Amendment. The conditions of his glaucoma required medical treatment. The conditions of his corneal graft required that Dr. Carter monitor that corneal graft and ensure that it was stable. And he did that. Now, the district court limited its ruling to conjunctivitis and incited case law to that effect. The conjunctivitis is not considered to be a serious medical condition. But I would agree with the court that Dr. Carter was required to monitor and treat his glaucoma and to ensure the corneal graft was stable. He did so. He did so repeatedly. Dr. Stitcher, an ophthalmologist, saw him and said that the corneal graft was stable. And that diagnosis was confirmed on numerous occasions in 2015. I think it's important to point out that again, Dr. Ehrenberg is not qualified to contest those assertions. He's not an ophthalmologist. He's not an optometrist. He is in no position to contest Dr. Carter's, Dr. Nim's, and our other experts who have stated that there is no evidence in the record that there was any sign of rejection or instability in the corneal graft. Did the infection that led to the loss of his eye could not have been present before October 18th, 2015? Is that the case? We have qualified medical expert testimony that states exactly that, that the first indication of infection or corneal rejection occurred on October 18th, 2015, more than three weeks after Dr. Carter's last examination. And once again, Dr. Ehrenberg, because he's not an ophthalmologist, because he's not an ophthalmologist, is not qualified to contest those opinions. That's all I have. If there are no questions from the court, I'd like to turn this over to my co-defendant's counsel. Thank you very much. Ms. Tischer. May it please the court. The delimited indifference standard is not a negligence standard. It requires proof that the defendant had actual knowledge of an excessive risk to the inmate's health, and that the doctor acted recklessly in the face of that knowledge. Dr. Osmundson referred Mr. Donald outside for specialty care the very first time he saw him on October 19th. And unlike those cases where officials refused to follow the recommendations of treating specialists, Dr. Osmundson followed each and every recommendation that he received back from the specialist. Was Dr. Osmundson deliberately indifferent because Mr. Donald was seen by an optometrist on October 19th? And the answer to that is no. Dr. Osmundson referred him out for a specialty review. He did not know that Mr. Donald was examined by an optometrist rather than an ophthalmologist. But even if he knew that fact, it would not have been reckless or outside the bounds of medical judgment to defer to an optometrist diagnosis. Optometrists receive four specialized years of training in order to be able to examine patients' eyes, diagnose conditions, and prescribe treatment. When Dr. Osmundson sent Mr. Donald out for care, he suspected an infection. But the specialist who microscopically examined Mr. Donald's eye on October 19th said, this isn't an eye infection, this is a probable rejection of his corneal graft. On top of that, the optometrist, Dr. Crow, consulted with the corneal specialist, Dr. Sisher, that day. She called Dr. Sisher on the phone and said, this is what I'm seeing. This is what I'm finding. She described everything that she saw and found. And Dr. Sisher said, yes, that sounds like a corneal graft rejection. I'm going to change his steroid to see if we can save that graft. Send an order back to the prison and ask them to change his steroid. Mr. Donald returned to the prison, and that's exactly what Dr. Osmundson did. He changed to the steroid that Dr. Sisher had recommended to save the graft. So no reasonable jury could find that deference to those treatment recommendations by an optometrist and an ophthalmologist was outside the bounds of medical judgment. So, Ms. Teuscher, was Dr. Osmundson authorized, in essence, to just unilaterally order this emergency outside consultation without having to go through what other cases talk about as a collegial review process? He was in this instance, Judge Hamilton, because he made an urgent referral. And when the doctor makes the determination that the referral is either or, he has the authority to do that without seeking collegial review. Is there a difference between urgent and emergent? I think in the doctor's mind, there may be. But in this case, it doesn't much matter because he sent him. That's a nuance that has eluded me so far. Next, did Dr. Osmundson know that Mr. Donald may not have been receiving his antibiotic drops between the 22nd and the 26th of October? And here, while there's a lot of evidence that Mr. Donald was taking his antibiotic drops, again, plaintiff has produced no evidence that even if Mr. Donald didn't have his drops or wasn't taking them appropriately, there's absolutely no evidence that Dr. Osmundson was aware of that. And Mr. Donald himself testified at his deposition. Dr. Pike explained to me on October 22nd, how important these antibiotics were. He told me how I should take them. Dr. Pike verified that in his own testimony. And then Mr. Donald said, I took the antibiotics in accordance with Dr. Pike's instructions. And that's inconsistent with a position that he didn't have his drops or that he didn't take his drops. On top of that, there's nothing in the charting where Mr. Donald was complaining that he didn't receive his drops. Nothing in the Illinois River records, nothing in the IEC records. There's no grievance by Mr. Donald saying I wasn't getting my eye drops. And again, even if we accept that for the purposes of this hearing, there's no evidence Dr. Osmundson was aware of that fact. Finally, was Dr. Osmundson deliberately indifferent to Mr. Donald's between the 22nd and the 26th of October. And that would require a finding that he had actual knowledge of a significant deterioration in Mr. Donald's condition over that time period. Not that he should have known. Plaintiff talks a lot in terms of what Dr. Osmundson should have known, but that's in the negligence realm. And with respect to Dr. Osmundson, we're only talking about a deliberate indifference action. So that requires actual knowledge, and that's what plaintiff is missing. What Dr. Osmundson knew on October 22nd was that the experts had diagnosed him with an infection. Dr. Pike is a corneal specialist. On the 22nd, he prescribed antibiotics for Mr. Donald. When Mr. Donald returned to the prison, Dr. Osmundson immediately ordered the antibiotic eye drops that Dr. Pike had recommended. The nurse delivered the antibiotic drops to Mr. Donald. Mr. Donald was kept in the infirmary so that Dr. Osmundson knew that he would be monitored. Dr. Osmundson never had any knowledge of a deterioration in the way Mr. Donald's eye looked or in his visual acuity until he got the call in the morning of October 26th that Mr. Donald's eye was bleeding. And again, he immediately sent him back to the Illinois Eye Center. For all of these reasons, we'd ask that the court affirm the summary judgment in favor of Dr. Osmundson. And with respect to Wexford, I think plaintiff has essentially forfeited the argument with respect to Wexford. Plaintiff says that if you reverse as to Dr. Carter or Dr. Osmundson, that you must necessarily reverse as to Wexford, and that's not true. Plaintiff would have the additional burden of establishing that those physicians were acting as the result of a Wexford policy or a customer practice that was the driving force behind their actions. Plaintiff didn't argue that in his appellant's brief, and that argument has been forfeited. So for those reasons, we'd ask that you affirm summary judgment in favor of all Wexford defendants. Thank you, Mr. Mr. Brewer. Counsel, we can't hear you. We can't hear you. Okay. Briefly, to accept defendants position. This inmate here is going to need to get three experts, he's going to have to have Dr. Earhart, who's got experience in the prison, as a prison doc, he's going to need to have an optometrist, and he's going to need to have an ophthalmologist. Now, that's just simply not the law. But to bite on that invitation, that would clean up these cases real quick, because unless they had all three of those experts willing to testify, then they couldn't proceed. Now, there's not an actual requirement that you even have expert testimony in a deliberate indifference case, but we had Dr. Earhart. He never saw a medical doctor for almost a year. Now, we can talk about steroids and treatment for his glaucoma, but Dr. Carter was no more qualified to treat this complicated ophthalmological condition more than I would be to start up the space shuttle. And that's the problem here. You've got a situation where you've got a non-physician corralling this guy and not letting him get seen. I don't think that's the law, but just last point is, if the court is going to find no deliberate indifference, I don't believe the court should have gutted our med mal case against Dr. Carter. I don't think it was clear. I think there's some but if the court is inclined to gut the 1983 actions on deliberate indifference, clearly they should have not issued the ruling that handcuffs us going forward in the med mal case. Thank you, Your Honor. You are in a position to go forward on a malpractice claim regarding the October 2015 loss of the eye, is that right? Yes, but not against Dr. Carter. The court has ruled that we can't do that. Understood. Thank you. Thanks to both counsel and the case is taken under review.